**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| RED BADGE INVEST LTD., | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | )     No. 1:23-cv-13100-JEK |
| | ) |
| AMERICAN WELL CORPORATION, | ) |
| | ) |
|      Defendant. | ) |

---

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

**KOBICK, J.**

      This is a breach of contract action by plaintiff Red Badge Invest LTD. against defendant American Well Corporation ("Amwell"). Red Badge alleges that Amwell breached an Investors' Rights Agreement ("IRA" or "Agreement") when it failed to notify Red Badge of a registered offering that gave shareholders the opportunity to sell shares of Amwell's stock at a preferred rate. Amwell moves to dismiss the complaint, arguing that Red Badge was not a party to the IRA, that Red Badge did not have notification rights under the IRA, and that the purported assignment of claims from Red Badge's nominee shareholder to Red Badge after the alleged breach is void. For the reasons that follow, the Court agrees that Red Badge was not a party to the IRA and cannot assert claims that may have accrued to its nominee holder. Nevertheless, the motion to dismiss will be denied because the complaint plausibly alleges that Red Badge was a third-party beneficiary of the IRA.

## BACKGROUND

The following facts, which are drawn from the complaint and the documents incorporated therein, are treated as true for purposes of the motion to dismiss. *See Lanza v. Fin. Indus. Regul. Auth.*, 953 F.3d 159, 161 (1st Cir. 2020).

### I.  **Factual Allegations.**

Red Badge is a "limited company" organized under the laws of the British Virgin Islands ("BVI") with its principal place of business in Hong Kong. ECF 1, ¶ 7. Red Badge's principal representative is Alireza Ittihadieh, and Red Badge is held by a trust that has named Ittihadieh as its primary beneficiary. *Id.* ¶ 14. Amwell is a telemedicine and software corporation organized under the laws of Delaware with its principal place of business in Massachusetts. *Id.* ¶¶ 8, 13.[1]

---

[1] Red Badge asserts that the Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a). ECF 1, ¶ 9. "'Federal courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when,'" as here, "'no party challenges it.'" *Industria Lechera De P.R., Inc. v. Beiro*, 989 F.3d 116, 120 (1st Cir. 2021) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)). For purposes of diversity jurisdiction, a corporation is a citizen of the state in which it is incorporated and the state where it has its principal place of business. *BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 696 (1st Cir. 2023). Non-corporate entities, such as limited liability companies, "take the citizenship of all of their members." *Id.*

The First Circuit has not addressed whether a "limited company" organized under the laws of the BVI should be treated as a corporation or a non-corporate entity. But other federal courts have concluded that "limited companies" organized under the laws of British Overseas Territories, such as the BVI, should be treated as corporations for diversity purposes. *See Superl Sequoia Ltd. v. Carlson Co., Inc.*, 615 F.3d 831, 832 (7th Cir. 2010) (treating Hong Kong "limited company" as a corporation because it was "'limited by shares,' a status in the Commonwealth of Nations that we have held is equivalent to a corporation in the United States"); *cf. JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 100 (2002) (finding that respondent "corporation," a limited company organized under the laws of the BVI, was a citizen of the United Kingdom). And the fact that Red Badge has issued stock suggests that it is a corporation rather than an unincorporated entity. *See* ECF 2. The Court thus regards Red Badge as a foreign corporation. Having so concluded, the Court has diversity jurisdiction over this action because Red Badge is a citizen of a foreign state, Amwell is a citizen of Delaware and Massachusetts, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a)(2).

Between December 2006 and November 2012, Red Badge acquired 50,000 shares of Series A Convertible Preferred Stock and 33,333 shares of Series B Convertible Preferred Stock in Amwell (the "Pre-IPO Shares"). *Id.* ¶¶ 15-16. The relationship between Amwell and its shareholders is governed by the Second Amended and Restated Investors' Rights Agreement (the "IRA" or "Agreement"), dated October 8, 2010. ECF 21-1. At present, Red Badge and Amwell are both parties to the IRA. ECF 1, ¶ 2.

In November 2012, Red Badge engaged Banque SYZ Ltd. ("Banque Syz") to act as a "nominee holder" for the Pre-IPO Shares and informed Amwell of the arrangement. *Id.* ¶ 16. Amwell understood that Red Badge would remain the beneficial owner and the real party in interest for the Pre-IPO Shares. *Id.* On November 15, 2012, Banque Syz and Red Badge executed an Instrument of Succession, pursuant to which Banque Syz became a party to the IRA. *Id.* ¶ 17. The complaint does not state whether Red Badge was a party to the IRA prior to this date.

Before and after Banque Syz became party to the IRA, Amwell communicated directly with Red Badge regarding the Pre-IPO Shares. *See id.* ¶ 18. These communications included emails addressed to Amwell's stockholders, sent on March 14, 2013 and November 20, 2013, *see id.* ¶¶ 19-20, and emails addressed to the "Partners of American Well," sent on November 7, 2014 and July 27, 2020, *id.* ¶¶ 21, 25. "For years, including in 2013 and 2015," Amwell sent Red Badge "Confidential" documents, including "Investor Updates" and "Partners Newsletters." *Id.* ¶ 26.

In September 2017, Ittihadieh and Red Badge requested documents related to their stock holdings from Amwell. *Id.* ¶ 22. This prompted Amwell and Ittihadieh to enter into a Confidentiality Agreement, which defined Ittihadieh as a "Shareholder" with "holdings of equity interests in American Well Corporation." *Id.* Amwell produced confidential documents to Red Badge after the agreement was executed, and then again in 2018 and 2020. *Id.* ¶¶ 22-24.

3

On August 24, 2020, Amwell filed a Form S-1 with the Securities and Exchange Commission ("SEC") in preparation for its initial public offering ("IPO"). *Id.* ¶ 30. Amwell went public on September 16, 2022, selling approximately 41 million shares of Class A common stock at a price of $18 per share. *Id.* ¶ 31. Red Badge's Pre-IPO Shares were converted into 711,109 shares of Class A common stock in Amwell following the IPO. *Id.* ¶¶ 31, 37. The IRA barred Amwell's common stockholders from selling their shares, without prior written consent, for 180 days following the IPO (the "Lock-Up Period"). *Id.* ¶ 32.

On September 17, 2020, one day after the IPO, Amwell contacted Ittihadieh to request contact information. *Id.* ¶ 33. Banque Syz responded the following day and provided the email address "ops.fsp@syzgroup.com," which Amwell entered into its "stockholder records." *Id.* ¶¶ 33-34. Amwell had previously sent correspondence regarding Shareholder Resolutions to this email address in July and August 2020, *id.* ¶ 35, and it continued sending emails, which had attachments containing IPO and tax documents, to this address in September and October 2020, *id.* ¶¶ 35-36.

On December 18, 2020, as required by § 2.2(a) of the IRA, Amwell sent a letter notifying certain Class A common stockholders that it intended to propose a public offering of its Class A shares (the "Registered Offering"). *Id.* ¶ 38; *see* ECF 21-1, § 2.2(a). The letter instructed recipients on how to include their shares in the offering and set a deadline of January 7, 2021 for doing so. ECF 1, ¶ 39. Since the Registered Offering was scheduled to occur during the Lock-Up Period, it afforded Class A common stockholders the opportunity to monetize their stock when they were otherwise barred from doing so. *Id.* ¶ 40. Amwell did not deliver the letter—via mail, email, or any other means—to Red Badge or to the ops.fsp@syzgroup.com email address specified by Banque Syz in September 2020. *Id.* ¶ 41. As a result, Red Badge was unaware of the Registered

Offering and did not submit the required documents for including its shares by the January 7, 2021 deadline. *Id.* ¶ 43.

On January 12, 2021, Amwell filed a Form S-1 with the SEC in connection with the Registered Offering. *Id.* ¶ 42. It proceeded to sell over 11,000,000 shares of Class A common stock at a price of $27.50 per share. *Id.* If Red Badge had sold its shares of Class A common stock during the Registered Offering, it would have received a return of nearly $20 million. *Id.* ¶ 44. The value of the shares has dropped significantly since then. *Id.* On December 13, 2023, for example, Amwell's Class A common stock was trading for around $1.25 per share. *Id.*

Red Badge repeatedly requested proof that Amwell sent a notice of the Registered Offering to ops.fsp@syzgroup.com, but Amwell has taken the position that Red Badge was not a stockholder and, therefore, had no interest in knowing whether such a notice was delivered. *See id.* ¶ 45. On December 12, 2023, Red Badge notified Amwell that Banque Syz would be transferring the shares and assigning any breach of contract claim it might have regarding the IRA to Red Badge. *Id.* ¶ 46; *see* ECF 1-1 (transfer notice). Red Badge also notified Amwell that it "would be executing a joinder to the IRA pursuant to Section 2.8 of the IRA." ECF 1, ¶ 46. Red Badge and Banque Syz subsequently executed a Share Transfer Agreement, Joinder Agreement, and Assignment Agreement, each of which was dated December 13, 2023. *Id.*; *see* ECF 1-2 (Share Transfer Agreement); ECF 1-3 (Joinder Agreement); ECF 1-4 (Assignment Agreement).

## II.    <u>Terms of the IRA.</u>

Several provisions of the IRA are relevant to Red Badge's allegation that Amwell breached its obligation to notify Red Badge of the Registered Offering, as required by § 2.2(a) of the IRA. First, § 2.2(a) ("Company Registration") reads, in relevant part:

5

> If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders . . . the Company will: (i) promptly give written notice of the proposed registration to all Holders; and (ii) include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in Section 2.2(b) below, and in any underwriting involved therein, all of such Registrable Securities as are specified in a written request or requests made by any Holder or Holders received by the Company withing twenty (20) days after such written notice from the Company is mailed or delivered.

ECF 21-1, § 2.2(a). Section 8.2 of the IRA provides that all notices "shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand or by messenger addressed: . . . if to any Holder, at such address, facsimile number or electronic mail address as shown in the Company's records, or, until such holder so furnishes an address, facsimile number or electronic mail address to the Company, then to and at the address of the last holder of such shares for which the Company has contact information in its records." *Id.* § 8.2.

The terms "Holders" and "Investors," which are used throughout the IRA, are defined in § 1.1 of the Agreement. A "Holder" is any individual or entity that satisfies one of the following definitions:

> (i) any Investor that holds Registrable Securities, (ii) any holder or Registrable Securities to whom the registration rights conferred by this Agreement have been duly and validly transferred in accordance with Section 2.12 of this Agreement, and (iii) the holder of the Registrable Securities issued or issuable upon exercise or conversion of the Warrant[.]

*Id.* § 1.1(f). "Investors," in turn, are defined as "the persons and entities listed on Exhibit A hereto." *Id.* § 1.1(*l*).[2]

---

[2] Red Badge refers to the IRA throughout the complaint, *see* ECF 1, ¶¶ 2, 3, 5, 6, 17, 18, 27-29, 41, 43, 45, 46, 48-54, but it did not submit a copy of that contract with the complaint. Both parties, however, submitted copies of the IRA while briefing Amwell's motion to dismiss. *See* ECF 19-1; ECF 21-1. With the exception of Exhibit A to the IRA—which only Amwell has submitted—the parties have produced identical copies of the IRA, and neither party disputes the authenticity of the document itself. *Compare* ECF 19-1, *with* ECF 21-1. "When, as now, a

The IRA also contains clauses restricting shareholders' ability to make transfers and assignments. Section 2.8 ("Restrictions on Transfer") states in relevant part: "Each Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Restricted Securities, or any beneficial interest therein, unless and until . . . the transferee thereof has agreed in writing for the benefit of the Company to take and hold such Restricted Securities subject to, and to be bound by, the terms and conditions set forth in this Agreement, including, without limitation, this Section 2.8 and Section 2.10." *Id.* § 2.8. This provision establishes three additional prerequisites to any transfer, but none are relevant to this case.

Section 8.4 of the IRA ("Successors and Assigns") states:

> Except as set forth herein, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of [Amwell]. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

---

complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). The IRA may therefore be considered in deciding Amwell's motion to dismiss.

The Court will not, however, consider Exhibit A to the IRA submitted by Amwell—which purportedly lists Amwell's "Shareholder[s]'"—because Red Badge disputes its authenticity. *See id.* Specifically, Red Badge states that Exhibit A was not attached to the copy of the IRA that Amwell filed with the SEC on August 24, 2020, and contends that the document "bears clear indicia of inauthenticity." ECF 20, at 11. For example, Red Badge notes that the font type and size used in Exhibit A differ from the font used in the IRA itself, and that the "Shareholder" list appears to be digitally superimposed over a scan of the original paper document. *See id.* at 11-12. The Court finds that Red Badge has raised a genuine dispute regarding Exhibit A's authenticity and consequently declines to consider it in deciding this motion. *See Beddall*, 137 F.3d at 17; *cf. Coffin v. Bowater Inc.*, 224 F.R.D. 289, 291 (D. Me. 2004) (granting motion to strike agreements referenced in amended complaint, for the purpose of deciding a motion to dismiss, after plaintiffs raised bona fide concerns regarding the agreements' authenticity).

*Id.* § 8.4.

Finally, the IRA contains an integration clause, *id.* § 8.5, and a choice-of-law provision stating that the IRA "shall be governed in all respects by the internal laws of the State of Delaware," *id.* § 8.3.

### III.   **Procedural History.**

Red Badge filed this action against Amwell on December 15, 2023, two days after Red Badge and Banque Syz executed the Share Transfer Agreement, Joinder Agreement, and Assignment Agreement. ECF 1. Asserting a single breach of contract claim, the complaint alleges that Amwell breached the IRA by failing to provide Red Badge notice of the opportunity to sell stock during the Registered Offering, in accordance with § 2.2(a) of the IRA. *Id.* ¶¶ 47-54. The complaint advances several conceptually distinct theories as to how the alleged breach occurred. Red Badge first alleges that Red Badge and Amwell are parties to the IRA, and that Amwell directly breached the notice rights held by Red Badge by virtue of its party status. *Id.* ¶ 48. Alternatively, Red Badge alleges that Banque Syz and Amwell were parties to the IRA when the breach occurred, and that Red Badge was a third-party beneficiary of the IRA. *Id.* ¶ 49. In a third and fourth alternative theory, Red Badge alleges that Banque Syz either transferred its breach of contract claim to Red Badge in the December 13, 2023 Share Transfer Agreement, or assigned its breach of contract claim to Red Badge through the December 13, 2023 Assignment Agreement. *Id.* ¶¶ 46, 50. Amwell moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF 17. After receiving Red Badge's opposition, the Court held a hearing on the motion and took the matter under advisement. ECF 20, 32.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

## DISCUSSION

### I.    <u>Choice of Law.</u>

In a diversity action like this, the Court must apply "Massachusetts choice-of-law rules to determine the applicable law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 20 (1st Cir. 2021). Massachusetts courts will enforce express and specific choice-of-law provisions "'as long as the result is not contrary to public policy.'" *Oxford Global Res., LLC v. Hernandez*, 480 Mass. 462, 468 (2018) (quoting *Hodas v. Morin*, 442 Mass. 544, 549-50 (2004)). A provision is contrary to public policy when either "'(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) [where] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state [in the determination of the particular issue] and is the State whose law would apply . . . in the absence of

9

an effective choice of law by the parties.'" *Id.* at 469 (alterations in original) (quoting *Hodas*, 442 Mass. at 550).

Section 8.3 of the IRA states that it "shall be governed in all respects by the internal laws of the State of Delaware." ECF 21-1, § 8.3. This provision is express and specific, and the parties agree that Delaware law applies to Red Badge's breach of contract claim. Further, Amwell is incorporated in Delaware, so there is a substantial relationship between Delaware and the parties, and neither party has suggested that another state has a "materially greater interest" in the determination of this action. *Oxford Global*, 480 Mass. at 469. The Court will therefore enforce the IRA's choice-of-law provision and apply Delaware law to this dispute.

## II.    <u>The Breach of Contract Claim.</u>

To state a claim for breach of contract under Delaware law, Red Badge must plausibly allege (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages suffered as a result of the breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). "'Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party.'" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)). The court must "'give priority to the parties' intentions as reflected in the four corners of the agreement,'" and it must "'interpret clear and unambiguous terms according to their ordinary meaning.'" *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759-60 (Del. 2018) (quoting *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779-80 (Del. 2012)).

The complaint plausibly alleges facts sufficient to establish the second and third elements of a breach of contract claim. Pursuant to § 2.2(a) of the IRA, Amwell was obliged to notify all

Holders of the Registered Offering. *See* ECF 21-1, § 2.2(a)(i). The complaint alleges that Amwell breached this provision by failing to send the requisite notice to Red Badge or the email address on record for it, ops.fsp@syzgroup.com. ECF 1, ¶¶ 33-34, 41. The complaint also alleges that Red Badge suffered damages. *Id.* ¶¶ 4-6, 54. Amwell does not meaningfully dispute the sufficiency of the complaint's allegations concerning either of these elements.

Amwell instead argues that Red Badge cannot satisfy the first element of its breach of contract claim because it was not a party to the IRA. "'As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions.'" *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022) (quoting *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007)).[3] Red Badge contends that it satisfies this requirement, and can enforce the IRA, under any of four distinct theories. First, Red Badge argues that it can assert a direct breach of contract claim against Amwell because, at the time of the alleged breach, (1) it was a party to the IRA with notice rights, or, in the alternative, (2) it was a third-party beneficiary of the IRA. Second, Red Badge claims that it may assert any claim that accrued to Banque Syz at the time of the alleged breach of the IRA's notice provision because (3) the claim travelled with the shares that Banque Syz transferred to Red Badge pursuant to the December 2023 Share Transfer Agreement, or, in the alternative, (4) Banque Syz assigned the claim to Red Badge through the December 2023 Assignment Agreement. Amwell directly challenges three of these

---

[3] Delaware courts treat this as a standing requirement. *See, e.g.*, *Bako Pathology*, 288 A.3d at 270-71. To avoid conflating this requirement with the elements of Article III standing, the Court treats this as a prerequisite to establishing the existence of an enforceable contract, rather than referring to it as a standing requirement.

theories in its motion to dismiss, but it does not address Red Badge's contention that it was a third-party beneficiary to the IRA.[4]

For the reasons explained below, the Court concludes that Red Badge was not a party to the IRA when the alleged breach occurred, and that it cannot assert any claim that accrued to Banque Syz while Banque Syz served as Red Badge's nominee holder. The Court further concludes that the complaint plausibly states a breach of contract claim against Amwell on the theory that Red Badge was a third-party beneficiary of the IRA.

A.    Red Badge Was Not a Party to the IRA When the Alleged Breach Occurred.

The complaint does not allege that Red Badge was a party to the IRA or a Holder, as the term is defined in the IRA, when Amwell allegedly breached § 2.2(a)'s notice requirements in December 2020 and January 2021.[5] Viewing the complaint's allegations in the light most favorable to Red Badge, the Court cannot reasonably infer that Red Badge was a party to the IRA when the alleged breach occurred. *See Iqbal*, 556 U.S. at 678. Instead, the only plausible inference the Court can draw from the complaint and attached documents is that Banque Syz, as the nominee holder of Red Badge's shares, was the party to the IRA with respect to those shares at the time of the alleged breach.

The complaint alleges that Red Badge began acquiring Series A Convertible Preferred Stock and Series B Convertible Preferred Stock in Amwell in 2006. ECF 1, ¶ 15. Red Badge did not designate Banque Syz as the nominee holder of its shares until November 2012. *Id.* ¶ 16. The

---

[4] At the motion to dismiss hearing, Amwell summarily argued that the third-party beneficiary theory was not viable.

[5] The complaint does not allege the precise date on which the breach occurred, but it states that Amwell distributed notice of the Registered Offering on December 18, 2020, and that the Registered Offering occurred in January 2021. *See* ECF 1, ¶¶ 38, 41-42.

Court can reasonably infer from these allegations that Red Badge, as an investor in Amwell, was a party to the IRA during this period. *See* ECF 21-1, at 4 (noting that the IRA governs the relationship between Amwell and its investors). Then, the complaint alleges, on November 15, 2012, Red Badge and Banque Syz "executed an Instrument of Succession whereby [Banque Syz] became a party to the IRA." ECF 1, ¶ 17. Notably, this paragraph of the complaint does not indicate whether Banque Syz *replaced*, or simply *joined*, Red Badge as a party to the IRA when this transaction occurred.

However, the other allegations in the complaint, and the contracts attached thereto, can only plausibly be construed to indicate that Banque Syz *replaced* Red Badge as a party to the IRA in November 2012. "Succession" is the "act or right of legally or officially taking over a predecessor's . . . duties." Succession, Black's Law Dictionary (12th ed. 2024). Red Badge's allegation that it executed an "Instrument of Succession" with Banque Syz, whereby Banque Syz "became a party to the IRA," therefore suggests that Banque Syz replaced Red Badge when it became a party to the IRA in 2012. ECF 1, ¶ 17. Three provisions in the December 13, 2023 Joinder Agreement confirm this conclusion. First, the Joinder Agreement's "whereas" clauses identify Banque Syz, but not Red Badge, as a party to the IRA. *See* ECF 1-3, at 1. Second, the Joinder Agreement states that, as a consequence of the agreement, "Banque Syz shall no longer be a party to the IRA and Red Badge will hereby become a party to the IRA." *Id.* Third, the Joinder Agreement states again that, upon its execution, "Red Badge shall become a party to the IRA and Banque Syz shall cease to be a party to the IRA." *Id.* The repeated assertion that Red Badge *became* a party to the IRA upon the execution of the Joinder Agreement indicates that Red Badge was not a party to the IRA before that December 13, 2023 transaction. *See NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates

under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).

The complaint's allegations mirror the language in the Joinder Agreement. Specifically, the complaint alleges that, as of December 15, 2023, "Red Badge and Defendant *are* parties to a valid and enforceable contract, the IRA," or, "[a]lternatively, Banque Syz and Defendant *were* parties to the IRA and Red Badge was a third-party beneficiary of the IRA." ECF 1, ¶¶ 2, 48-49 (emphases added). The allegation that Red Badge is currently a party to the IRA, when considered alongside the omission of any allegation that Red Badge was a party to the IRA when the breach occurred, strongly suggests that this omission was intentional because Red Badge was not a party to the IRA at the time of the alleged breach.

In sum, the complaint does not allege that Red Badge was a party to the IRA when the alleged breach occurred; to the contrary, its allegations suggest, and the Joinder Agreement confirms, that Red Badge was not a party to the IRA in December 2020 and January 2021. Red Badge is not, accordingly, entitled to assert a direct breach of contract claim on the theory that it was a party to the IRA at the time Amwell allegedly breached § 2.2(a)'s notice requirements.

B.    The Breach of Contract Claim Did Not Travel with the Shares.

Red Badge argues alternatively that "any direct claims" that accrued to Banque Syz while it served as a nominee holder "travelled with the Shares" when Banque Syz transferred them back to Red Badge on December 13, 2023 via the Share Transfer Agreement. ECF 20, at 15. Invoking the contemporaneous ownership requirement, Amwell contends that this argument fails in light of Delaware's "'longstanding . . . public policy against the evil of purchasing stock in order to attack a transaction which occurred prior to the purchase of the stock.'" ECF 18, at 13 (quoting *Omnicare Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. 2002)). Citing more recent case law,

Red Badge responds that Delaware has no such public policy and has not embraced a contemporaneous ownership requirement for breach of contract claims. ECF 20, at 13-15 (citing *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 1002 & n.66 (Del. Ch. 2024) (explaining that "Delaware has not invented a common law contemporaneous ownership requirement for direct claims," and that *Omnicare* "is not persuasive")).

The Court need not resolve this dispute because even assuming, favorably to Red Badge, that no such contemporaneous ownership requirement exists under Delaware law for breach of contract claims, any breach of contract claim Banque Syz could assert against Amwell arising out of the IRA's notice provision was a personal right that did not travel with the shares in the Share Transfer Agreement. Under Delaware law, "'a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer.'" *Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 677 (Del. 2020) (quoting 6 Del. C. § 8-302(a)). A legal claim is, in certain circumstances, a "right" that travels with a transferred security. To determine whether a claim travels with securities, Delaware courts distinguish "between personal rights of the holder, on the one hand, and rights that inhere in the security itself, on the other." *Id.* (citation and quotation marks omitted). Rights that inhere in a security travel with it; personal rights do not. *See id.*

Delaware law generally considers claims arising from "the close relationship between the stock and the claims asserted" to inhere in a security because the "rights are more than just incidental to the ownership of stock." *Id.* For example, claims of corporate charter breaches and violations of executive compensation agreements travel with the shares because "the injury 'is to the stock and not the holder.'" *Id.* (quoting *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009)). For personal claims, on the other hand, "'the nature of the underlying property does not matter. The property happens to be shares, but the cause of action is not a property right carried by the

15

shares.'" *Id.* (quoting *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015), *as revised* (May 21, 2015), *judgment entered sub nom. In re Activision Blizzard, Inc. S'holder Litig.*, No. 8885-cv-VCL, 2015 WL 2415559 (Del. Ch. May 20, 2015)). A "'[q]uintessential exampl[e]'" of a personal claim "'would include a contract claim for breach of an agreement to purchase or sell shares.'" *Id.* (quoting *Activision Blizzard*, 124 A.3d at 1056).

The breach of contract claim allegedly held by Banque Syz is analogous to this "quintessential example" of a personal claim. As Red Badge frames the theory, Amwell allegedly breached the notice requirements set forth in § 2.2(a) of the IRA, thus depriving Banque Syz "of its right to participate" in the Registered Offering. *See* ECF 1, ¶ 53. Put differently, Banque Syz was injured because it lost the opportunity to sell its Class A common stock during the Lock-Up Period and maximize the return on its investment in Amwell. *See id.* ¶ 44 (comparing value of shares on December 13, 2023, with their value during the Registered Offering). But while the transferred shares are worth less today than they were at the time of the Registered Offering, Red Badge has not alleged that Amwell's breach of the IRA's notice provision *itself* diminished the value of the Class A common stock; rather, as this theory is alleged, Amwell's noncompliance with the notice provisions simply hindered Banque Syz's ability to maximize potential profits by selling its shares at an opportune moment. On this theory, the injury is to the holder of the stock, not to the stock itself. *See Urdan*, 244 A.3d at 677. Any breach of contract claim that Banque Syz might have arising out of Amwell's alleged noncompliance with the notice provisions in § 2.2(a) of the IRA is, accordingly, personal rather than inherent in the stock, and did not travel with the shares when Banque Syz transferred them back to Red Badge in December 2023 via the Share Transfer Agreement.

16

C.    The Assignment Agreement Is Void Under the IRA.

Red Badge alternatively argues that, pursuant to the December 13, 2023 Assignment Agreement, Banque Syz assigned to Red Badge any breach of contract claim it possessed concerning the IRA. *See* ECF 1, ¶¶ 46, 50; ECF 1-4, ¶¶ 1-4. Amwell argues that the assignment is void because it violates the IRA's anti-assignment provision, which states that "any and all rights, duties and obligations hereunder, shall not be assigned . . . by any Investor without the prior written consent of [Amwell]," and that any such assignments made without Amwell's consent "shall be void." ECF 21-1, § 8.4. Red Badge contends that the purported assignment is valid notwithstanding § 8.4 because Delaware has a general policy of free assignability and, accordingly, "permit[s] assignments of claims for breach of contract even where a relevant contractual provision restricts assignments of 'the contract itself' or other rights and obligations thereunder." ECF 20, at 17 (emphasis removed) (citing *In re Abound Solar Mfg., LLC*, 547 B.R. 611, 619 (Bankr. D. Del. 2016)).

Following the Restatement (Second) of Contracts, Delaware courts "'generally construe [anti-assignment] provisions narrowly.'" *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, No. 2017-0486-SG, 2023 WL 6399095, at *17 (Del. Ch. Oct. 3, 2023) (quoting *Se. Chester Cnty. Refuse Auth. v. BFI Waste Servs. of Pa.*, LLC, 2017 WL 2799160, at *5 (Del. Super. 2017)); *see also In re Woodbridge Grp. of Cos., LLC*, 606 B.R. 201, 205 (D. Del. 2019) (same). But Delaware's policy favoring assignability is balanced against its policy of interpreting "clear and unambiguous terms" in a contract "according to their ordinary meaning." *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) (citation and quotation marks omitted). Delaware consequently follows the modern approach to interpreting anti-assignment provisions, which is to distinguish between provisions that restrict the parties' *right* to assign from those that

restrict the parties' *power* to assign. *See Chester Cnty.*, 2017 WL 2799160, at *5; Restatement (Second) of Contracts § 322 (1981).

Courts following the Restatement generally assume that an anti-assignment provision limits only the parties' *right* to assign, unless it expressly states that unpermitted assignments are void or invalid, in which case the provision limits the parties' *power* to assign. *See Chester Cnty.*, 2017 WL 2799160, at *5; *Straight Path*, 2023 WL 6399095, at *17 ("In order to prohibit a party's power to assign, a provision must expressly state that subsequent assignments will be void or invalid."); *cf. Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 442 (3d Cir. 1999) (to limit the power to assign, "the assignment provision must generally state that nonconforming assignments (i) shall be 'void' or 'invalid,' or (ii) that the assignee shall acquire no rights or the nonassigning party shall not recognize any such assignment"). If a provision limits only the parties' right to assign (e.g., by prohibiting assignments), "the assignment is valid and enforceable but generates a breach of contract action that the non-assigning party may bring against the party assigning its interest." *Chester Cnty.*, 2017 WL 2799160, at *5. But if an anti-assignment provision limits the parties' power to assign (e.g., by prohibiting assignments *and* deeming all nonconforming assignments null and void), courts will enforce the provision and declare the nonconforming assignment void. *See Woodbridge*, 606 B.R. at 206-07 (finding an assignment void because it was made in violation of a provision stating that "any such attempted assignment without such consent shall be null and void" (citation and quotation marks omitted)); *Paul v. Chromalytics Corp.*, 343 A.2d 622, 625-26 (Del. Super. Ct. 1975) (finding an assignment void because it was made in violation of a provision stating that any assignment made "without the written c[o]nsent of [one party] shall be void").

The anti-assignment provision in the IRA limits the parties' *power*, rather than their *right*, to make assignments because it expressly states that any assignments made without Amwell's written consent "shall be void." ECF 21-1, § 8.4. Where, as here, the contract's language is unambiguous and the parties' intent is clear, the Court must enforce this provision as written. *See Bathla*, 200 A.3d at 759; *Cox Commc'ns*, 273 A.3d at 760; Restatement (Second) of Contracts § 322. Banque Syz's purported assignment to Red Badge of any breach of contract claim it has against Amwell is therefore void because it was made without Amwell's consent, as required by § 8.4 of the IRA.[6]

        D.      <u>Red Badge Plausibly Alleges That It Was a Third-Party Beneficiary to the IRA.</u>

Red Badge's final theory is that, at the time of Amwell's alleged breach of the IRA, Banque Syz and Amwell were parties to the IRA, and Red Badge was a third-party beneficiary of that contract. "'To qualify as a third party beneficiary of a contract'" under Delaware law, "'(i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties'

---

[6] Red Badge also argues that Banque Syz validly transferred its asserted breach of contract claim pursuant to § 2.8 of the IRA and, therefore, § 8.4 does not apply. Specifically, Red Badge argues that Banque Syz's breach of contract claim constitutes a "beneficial interest" in the Amwell shares. *See* ECF 20, at 15-16. But this assertion is textually implausible, and Red Badge does not cite to any case law supporting its position. A "beneficial interest" is a "right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing." Beneficial Interest, Black's Law Dictionary (12th ed. 2024); *see* ECF 20, at 16 (same). As discussed, the breach of contract claim alleged in this case is a personal right, rather than a right that has inhered in the shares. *See Urdan*, 244 A.3d at 677. Even if one could characterize a legal claim as a "beneficial interest" in stock—and Red Badge has not cited to any authority asserting this proposition, nor has the Court identified any authority through its own research—it is not possible to characterize a *personal* breach of contract claim in such a manner. The breach of contract claim asserted in this action is a personal right, and, therefore, it cannot be characterized as a "right or expectancy *in*" the shares.

purpose in entering into the contract.'" *Bako Pathology*, 288 A.3d at 271 (quoting *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, Civ. No. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001)). "'A third-party beneficiary's rights are measured by the terms of the contract.'" *Id.* at 270-71 (quoting *NAMA Holdings*, 922 A.2d at 431). A stockholder's equity stake in a corporation, such as Red Badge's beneficial interest in the shares held by Banque Syz, ECF 1, ¶¶ 16, 18, "neither automatically confers nor automatically disqualifies [the] stockholder from demonstrating third-party beneficiary status to a corporate contract," *Arkansas Tchr. Ret. Sys. v. Alon USA Energy, Inc.*, Civ. No. 2017-0453-KSJM, 2019 WL 2714331, at *12 (Del. Ch. June 28, 2019), *judgment entered*, (Del. Ch. 2021); *see also Crispo v. Musk*, No. 2022-0666-KSJM, 2022 WL 6693660, at *3 (Del. Ch. Oct. 11, 2022) (noting that Delaware courts have "extended third-party beneficiary status to stockholders under corporate contracts in limited circumstances").

The first element of this standard—whether the contracting parties intended to benefit a third-party beneficiary—is the "key to third-party standing in contract law." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, Civ. No. 2822-CC, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008); *see* Restatement (Second) of Contracts § 302, cmt. a (1981) ("This Section distinguishes an 'intended' beneficiary, who acquires a right by virtue of a promise, from an 'incidental' beneficiary, who does not."). "'To determine whether the parties intended to make an individual a third-party beneficiary, the Court must look to the terms of the contract and the surrounding circumstances.'" *Alon*, 2019 WL 2714331, at *13 (quoting *Hadley v. Shaffer*, Civ. No. 99-144-JJF, 2003 WL 21960406, at *5 (D. Del. Aug. 12, 2003)); *cf.* 13 Williston on Contracts § 37:10 (4th ed.) ("[I]n most jurisdictions, the intent to benefit a third party can be shown not only by the contract's express language but also by the surrounding circumstances, and many modes of expression of intent are accepted by the courts.").

Red Badge is correct that Delaware courts have on several occasions "found stockholders to be third-party beneficiaries of corporate contracts." ECF 20, at 18-19. Each of the cases that Red Badge cites, however, arises from the alleged breach of a corporate merger agreement or related contract. *See Alon*, 2019 WL 2714331, at *1-2 (stockholder agreement entered with corporation pursuing merger); *Amirsaleh*, 2008 WL 4182998, at *1-2 (merger agreement); *Hadley*, 2003 WL 21960406, at *1 (merger agreement). Red Badge has not cited any precedent in which a beneficial holder of shares in a corporation has claimed that it was a third-party beneficiary of a contract entered by the entity's record holder and the corporation, *see* ECF 20, at 18-19, and the factual dissimilarities between this case and the merger cases limits the persuasive weight of Red Badge's argument.

Although it is a close question, the Court nevertheless finds that the complaint plausibly alleges that, on the unique facts of this case, Banque Syz and Amwell intended for Red Badge to receive the benefits of the notice rights provided in § 2.2(a) of the IRA. Unlike the merger agreements in *Amirsaleh* and *Hadley*, which included provisions that expressly created rights for the plaintiff-shareholders who later claimed third-party beneficiary status, the IRA does not expressly confer any rights upon beneficial owners like Red Badge. *Compare Amirsaleh*, 2008 WL 4182998, at *1 ("Under section 4.1 of the Merger Agreement, each [shareholder] was permitted to elect the form of consideration he or she would receive in the merger."), *and Hadley*, 2003 WL 21960406, at *1 ("Pursuant to the Merger Agreement, [certain unused funds were] to be disbursed to the former shareholders . . . according to a schedule in the Merger Agreement"), *with* ECF 21-1, § 2.2(a)(i) (requiring Amwell to "promptly give written notice of the proposed registration to all Holders"). But the absence of language expressly vesting rights in third-party beneficiaries is not dispositive. In *Alon*, the court found that a contract was intended to benefit a

21

corporation's shareholders, despite the lack of language explicitly stating this intent or identifying the shareholders, because it contained provisions that replicated statutory anti-takeover protections designed to protect stockholders by limiting "abusive takeover tactics" and encouraging "a full and fair offer." 2019 WL 2714331, at *12-13. The court found that the shareholders were intended third-party beneficiaries of the contract because the anti-takeover provisions provided them with "direct benefits" that, in view of "the surrounding circumstances[,] . . . were not mere coincidence"; rather, "they were clearly intended." *Id.* at *13.

*Alon*'s reasoning is persuasive here. The notice rights established by § 2.2(a) of the IRA are clearly intended to ensure that Amwell's shareholders are apprised of opportunities to sell their shares in registered offerings. ECF 21-1, § 2.2. As the "beneficial owner" of the shares, ECF 1, ¶ 16, Red Badge retained equitable title in its shares after designating Banque Syz as its nominee holder, *see* Beneficial Holder of Securities, Black's Law Dictionary (12th ed. 2024) (defining "beneficial holder of securities" as the "holder of equitable title to corporate stock"). The notice rights established by § 2.2(a) thus provided a "direct benefit" to Red Badge as the entity that purchased the shares and stood to benefit from their sale. *See Alon*, 2019 WL 2714331, at *13. Further, the complaint alleges that Amwell understood Red Badge to be the "beneficial owner" of the shares when Red Badge designated Banque Syz as its nominee holder in November 2012. ECF 1, ¶¶ 16, 18. Amwell's subsequent correspondence with Red Badge, through Ittihadieh, concerning the shares corroborates this understanding. *See id.* ¶¶ 18-26. It is therefore plausible that Banque Syz and Amwell intended for Red Badge, as the beneficial owner of the shares, to benefit from the notice rights provided by § 2.2(a) of the IRA. *See Alon*, 2019 WL 2714331, at *13.

The second and third elements of the third-party beneficiary standard are likewise plausibly alleged. As discussed, the Court finds it reasonable to infer that Red Badge became a party to the

IRA after it began acquiring Amwell stock in 2006. *See* ECF 1, ¶ 15. As a party to the IRA and the presumptive "Holder" of its shares, Red Badge would have been entitled to receive notice of registered offerings until it executed the Instrument of Succession with Banque Syz in November 2012. *See* ECF 21-1, § 2.2(a). It is plausible that when Banque Syz succeeded Red Badge as a party to the IRA, Amwell and Banque Syz intended for Red Badge to continue receiving notice of registered offerings "in satisfaction of [Amwell's] pre-existing obligation to [Red Badge]." *Bako Pathology*, 288 A.3d at 271. And given that Amwell understood that Red Badge was to remain the "real party in interest with respect" to its shares, ECF 1, ¶ 16, it is plausible that ensuring the continued dissemination of notice to Red Badge was material to Banque Syz and Amwell's intent when Banque Syz became a party to the IRA, *see Bako Pathology*, 288 A.3d at 271. The Court accordingly concludes that Red Badge has plausibly alleged a breach of contract claim on the theory that Banque Syz and Amwell were parties to the IRA, and Red Badge was a third-party beneficiary, at the time of Amwell's alleged breach of the IRA's notice provision.

### CONCLUSION AND ORDER

For the foregoing reasons, Amwell's motion to dismiss, ECF 17, is DENIED. Moving forward, Red Badge may pursue its breach of contract claim only on the theory that it was a third-party beneficiary of the IRA.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: February 18, 2025

23